IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02411-REB-CBS

KIRBY MARTENSEN,

        Plaintiff,

v.

WILLIAM KOCH,
DOES 6-25,

        Defendants.

---

## ORDER REGARDING PLAINTIFF'S MOTIONS TO COMPEL AND AMENDED MOTION FOR LEAVE TO EXTEND TIME LIMIT

---

Magistrate Judge Shaffer

      This matter comes before the court on Plaintiff Kirby Martensen's Motion to Compel Defendant William Koch's Deposition Testimony (doc. #76), filed on January 30, 2014, and Plaintiff's companion Amended Motion for Leave to Extend the Time Limit for Defendant Koch's Deposition (doc. #82), filed on February 6, 2014.  Also before the court is Plaintiff's Motion to Compel Production of Documents (doc. #108), filed on March 31, 2014, and Plaintiff's Motion to Compel Non-Party Deposition Testimony and Production of Documents (doc. #123), filed on April 18, 2014.  These motions were referred to this Magistrate Judge pursuant to memoranda dated January 30, 2014 (doc. #77), February 7, 2014 (doc. #83), April 1, 2014 (doc. #109), and April 21, 2014 (doc. #125), respectively.  This court has carefully considered the motions and related briefing, the entire case file, the comments offered by the parties during the October 23, 2013 Scheduling Conference and various motion hearings, discovery conferences, and status conferences, as well as

1

applicable case law.  For the following reasons, the Motion to Compel Deposition Testimony and Motion to Compel Documents are granted in part and denied in part; the Amended Motion for Extension is granted; and the Motion to Compel Non-Party Deposition Testimony and Production of Documents is denied.

## FACTUAL ALLEGATIONS

The sole remaining claim in Plaintiff's Revised Fourth Amended Complaint (doc. #111) is for false imprisonment.[1]  Mr. Martensen's allegations and version of the salient facts are set forth in detail in this court's June 12, 2014 Recommendation (doc. #151) and are condensed here for efficiency and ease of the reader.[2]  Defendant Koch is the founder, chairman, and majority owner of several companies including Oxbow Carbon, LLC ("Oxbow Carbon"), Oxbow Carbon & Minerals, LLC ("OCM"), and Oxbow Carbon & Minerals International, GmbH ("OCM International") (collectively "Oxbow").  In 2008, Plaintiff considered leaving his position with Oxbow to create a competing business venture, but ultimately abandoned the plan.  In 2010, Oxbow underwent a structural reorganization that Plaintiff believed was part of a scheme to evade paying taxes to the United States on annual profits in excess of $100,000,000.  *See* doc. #111, at ¶¶ 12-15. In late 2011, Mr. Martensen was promoted to the position of Senior Vice President-Asia with OCM International, which required him to relocate to Singapore; Plaintiff understood that this assignment was related to Oxbow's restructuring.

---

[1]On July 7, 2014, District Judge Blackburn adopted this court's Recommendation (doc. #151) and dismissed all of Plaintiff's claims in the Revised Fourth Amended Complaint save for the claim for false imprisonment (doc. #159).

[2]Suffice to say, this court expresses no views as to the ultimate merits of Plaintiff's claim or Defendant's affirmative defenses.

Defendant Koch received an anonymous letter in early 2011 that implicated Mr. Martensen and another employee in theft, breaches of fiduciary duty, fraud, and self-dealing against Oxbow. Based on this letter, Mr. Koch engaged the consulting firm Grant Thornton to conduct a comprehensive forensic review of thousands of documents, including letters, memoranda, and electronic corporate communications involving Plaintiff and several other employees. Mr. Martensen contends that through this review, Mr. Koch learned that Plaintiff and others had expressed concern over the legality of the company's tax strategy following the reorganization, and distrusted Oxbow upper management. Plaintiff further alleges that as a result of this forensic review, he was falsely imprisoned at Bear Ranch by Mr. Koch with the intention to intimidate him and chill his speech. *Id*. at ¶¶ 21-22.

Bear Ranch is located in a remote corner of Gunnison County, Colorado, approximately seventy miles from Aspen, Colorado, and is accessible only by a guarded, private road owned and maintained by Defendant. On the morning of March 21, 2012, Mr. Martensen flew from San Francisco to Aspen where Defendant Koch met and drove him, along with others, to Bear Ranch. Upon arriving, the guests learned that cellular service and internet access were not available at the Ranch. After lunch on March 22, 2012, Mr. Koch informed Plaintiff and others that a compensation specialist would conduct interviews as part of a "360 degree peer review." Thereafter, Defendant's agents interviewed Mr. Martensen in an office building for several hours, during which they accused Plaintiff of endeavoring to defraud Defendant and Oxbow, accepting bribes, and aiding Oxbow's competitors. Mr. Martensen learned that Mr. Koch knew of his aborted plan to leave Oxbow and form a competitor company, and that Defendant believed Plaintiff had colluded with a competitor. *Id.* at ¶¶ 27-31.

3

After the interview concluded at approximately 5:00 p.m., Defendant's agents escorted Mr. Martensen to his cabin so that he could pack his belongings. On the way, Plaintiff was served with termination papers and a lawsuit, *Oxbow Carbon, LLC et al. v. Martensen et al.*, Case No. 502012CA005386 (hereinafter "the Florida Action"), which had been filed in Circuit Court, Palm Beach County, Florida that same morning. Mr. Koch's agents searched Plaintiff's belongings while he packed, and then drove him to a cabin elsewhere on the Ranch where he was told to wait. Mr. Martensen was told, "A sheriff is here to make sure you don't wander off," and Plaintiff could see a uniformed police officer in a parked patrol car from the cabin room in which he waited. Plaintiff spent three hours in the cabin before Defendant's agents escorted him to a vehicle. Mr. Martensen was instructed to sit in the back of the vehicle along with a former co-worker, Wenming "Charlie" Zhan. Plaintiff asked the driver to take him to the airport in Aspen where he was scheduled to board a flight the following morning. The driver refused and drove Plaintiff and Zhan to a private airport outside of Denver. The drive from Bear Ranch lasted five hours, and the vehicle arrived at the airport at approximately 2:00 a.m. on the morning of March 23. Martensen and Zhan were told to board a private plane that was owned by Defendant and Oxbow. A pilot, co-pilot, and escort were waiting on the plane for Plaintiff and Zhan. The escort was a retired Florida police officer whom Mr. Martensen believed was armed with a weapon. The private plane arrived at an airport in Oakland, California at approximately 4:00 a.m. on the morning of March 23. One of the agents instructed Mr. Martensen to ride in a vehicle that would take him to a nearby hotel, but Plaintiff refused the directive and hailed a taxi to drive him to his home in Berkeley, California. *Id.* at ¶¶ 32-35.

Based on the foregoing facts, Mr. Martensen is seeking economic damages, non-economic

4

damages for "fear, anxiety, humiliation and emotional distress," and exemplary damages for

Defendant Koch's actions and/or omissions that "were willful, wanton, reckless, malicious,

oppressive and/or done with a conscious or reckless disregard" for Plaintiff's rights.   Defendant

Koch has asserted various affirmative defenses in response to Mr. Martensen's claim of false

imprisonment.   More specifically, in his Answer to Plaintiff's First Amended Complaint[3] (doc.

#1-65), Mr. Koch asserted that Mr. Martensen comes to the court with unclean hands as a result of

his "fraud, self-dealing, and participation in a fraudulent scheme against the Oxbow Companies";

that Plaintiff's false imprisonment claim is barred because Mr. Koch "did not directly or indirectly

cause the alleged conduct" asserted as the basis for that claim; and that Plaintiff's alleged detention

was "legally justified and/or privileged due in part to Martensen's theft, fraud, and other acts of

misconduct against the Oxbow Companies."[4]   Finally, Mr. Koch asserts that Plaintiff is not entitled

to punitive damages because he has not alleged "any conduct that would permit the imposition of

such damages."[5]

## PROCEDURAL BACKGROUND

Plaintiff's counsel deposed Defendant Koch for approximately seven and a half hours on

December 12, 2013, during which Mr. Koch invoked the attorney-client privilege and refused to

---

[3]Defendant Koch filed his Answer to First Amended Complaint on or about May 28, 2013, while this action still was pending in the Northern District of California.  At that time, Mr. Martensen was asserting claims for false imprisonment, civil conspiracy, and "42 U.S.C. § 1983 – Conspiracy."  During the status conference on June 27, 2014, I questioned counsel as to whether or to what extent Mr. Koch's previously identified affirmative defenses might impact the pending discovery motions.  I also gave counsel until July 8, 2014 to submit supplemental briefs on that question.

[4]*See* Affirmative Defenses Seven, Twelve, and Thirteen.

[5]*See* Affirmative Defense Eighteen.

answer certain questions regarding his knowledge of and participation in Oxbow's corporate restructuring, tax strategy, and the events at Bear Ranch during the weekend of March 21-22, 2012. On January 30, 2014, Mr. Martensen filed a Motion to Compel (doc. #76) further deposition testimony from Defendant Koch, and a related Motion to Extend the Time Limit (doc. #78) for Defendant Koch's deposition.  On February 6, 2014, Mr. Martensen filed an amended Motion to Extend (doc. #82) the time to take Defendant Koch's deposition.  Defendant filed his Response to Plaintiff's Motion to Compel (doc. #88) with an accompanying declaration (doc. #89) on February 20, 2014, and a Response to Plaintiff's Motion to Extend the Time Limit (doc. #90).  On July 8, 2014, Defendant filed a supplemental brief regarding Plaintiff's Motion to Compel Deposition Testimony (doc. #160).

At the conclusion of a motion hearing on February 24, 2014, this court allowed Defendant Koch to supplement his Response to Plaintiff's Motion to Compel to further address the applicability of the crime-fraud exception, and concurrently stayed Plaintiff's time to file his reply brief (doc. #92).  Defendant Koch filed a Supplemental Response on February 26, 2014 (doc. #93)[6], and Plaintiff filed a Reply To Defendants' Opposition to Motion to Compel (doc. #98) on March 7, 2014.  On March 31, 2014, Mr. Martensen filed a Motion to Compel (doc. #108), seeking an order that Defendant Koch produce documents and materials related to the March 21-22, 2012 events at Bear Ranch; evidence of damages resulting from Plaintiff's allegedly nefarious business practices; Oxbow's petroleum coke business in China; the Grant Thornton investigation; and the decision to

---

[6] Plaintiff amended his Complaint on January 7, 2014 to add as Defendants Oxbow and Oxbow's counsel, Mr. McAuliffe and Mr. Callahan.  *See* doc. #66.  Plaintiff then filed a notice of voluntary dismissal (doc. #91) on February 26, 2014 as to Mr. McAuliffe and Mr. Callahan.  On March 31, the parties stipulated to the dismissal of Defendant Oxbow (doc. #107), leaving Defendant Koch as the sole defendant.

transfer Plaintiff to Singapore.  More specifically, Plaintiff seeks:

1. The documents received or prepared by William Koch regarding the planning of events at Bear Ranch in March 2012 referred to at pages 22-23 of Mr. Koch's deposition.  (Request for Production No. 5).

2. The spreadsheets referenced at page 59 of Mr. Koch's deposition [representing calculations of lost profits caused by Plaintiff].  (Request for Production No. 6).

3. The study referred to at page 63 of Mr. Koch's deposition [pertaining to a 2008 study evaluating whether Oxbow should establish a distribution business in China]. (Request for Production  No. 7).

4. The written reports from Grant Thornton referred to at page 68 of Mr. Koch's deposition.  (Request for Production No. 8).

5. The notes prepared for the interview of Larry Black on March 22, 2012 referred to at page 88 of Mr. Koch's deposition.  (Request for Production No. 9).

6. The video and audio recordings of the interviews taken at Bear Ranch on March 22, 2012 referenced at pages 89-91 of Mr. Koch's deposition.  (Request for Production No. 10).

7. The "proof" of kickbacks referred to at page 93 of Mr. Koch's deposition.  (RFP No. 11).

8. The evidence of actual damages caused to Oxbow by Mr. Martensen referred to at pages 142-146 of Mr. Koch's deposition.  (Request for Production No. 12).

9. The employment contracts, severance agreements or related contracts entered into between Oxbow and Joe Lombardi since March 2012.  (Request for Production No. 13).

10. Documents that discuss Mr. Martensen's transfer to Singapore dated January 2010 through March 2012.  (Request for Production No. 17).

Defendant filed a Response to Plaintiff's Motion to Compel on April 11, 2014 (doc. #117) along with two accompanying declarations (doc. #118 and #119), and Plaintiff filed his Reply on April 15, 2014 (doc. #121).

On March 27, 2014, Plaintiff served three subpoenas:  (1) a subpoena for the testimony of

Frederick Bennett, a Grant Thornton employee, along with requests for production of documents; (2) a subpoena for the testimony of an Oxbow employee most knowledgeable regarding the company's tax reorganization plan; and (3) a subpoena for the testimony of an Oxbow employee most knowledgeable regarding the damages that Oxbow suffered as a result of Plaintiff's alleged misconduct.  On April 11, 2014, Defendant Koch and non-party Oxbow filed a motion to quash the Bennett subpoena in the U.S. District Court for the Northern District of Texas.  That same day, Oxbow filed in the U.S. District Court for the Southern District of Florida a motion to quash or, in the alternative, for a protective order regarding the subpoena for testimony of a "person most knowledgeable" as to the company's tax reorganization.  Plaintiff thereafter moved in the Texas and Florida courts to transfer the motions to quash to the District of Colorado, or in the alternative, to stay proceedings before those courts until the District of Colorado ruled on the privilege claims at issue in the motions to quash.

On April 17, 2014, this court held a status conference (*see* doc. #127) to discuss the Motion to Compel Deposition Testimony, the Amended Motion to Extend the Time Limit for Koch's Deposition, and the Motion to Compel Production of Documents.  At that conference, I addressed from the bench Plaintiff's invocation of the crime-fraud exception relative to Mr. Koch's assertion of the attorney-client privilege and work product doctrine.  The court found that Mr. Martensen had not presented sufficient evidence to support his claims of tax fraud and violation of 18 U.S.C. § 1512, but had established a prima facie case with regard to his false imprisonment claim.  Accordingly, I concluded that Plaintiff could assert the crime-fraud exception but only as to the latter alleged offense.

On April 18, 2014, Plaintiff filed a Motion to Compel (doc. #123) the deposition testimony

of Frederick Bennett and the production of documents.   Defendant Koch filed a Response to

Plaintiff's Motion to Compel on May 12, 2014 along with an accompanying exhibit (doc. #128 and

#129).   The following day, counsel for Mr. Bennett and Grant Thornton submitted a letter (doc.

#130) to this court stating their basis for moving to quash the Bennett subpoena in the Northern

District of Texas, and requesting that this court deny Plaintiff's Motion to Compel.   On May 14,

2013, Mr. Koch filed a notice (doc. #131) of an order issued by the Northern District of Texas,

denying Mr. Martensen's motion to transfer and granting Plaintiff's motion to stay the proceedings

pending "final resolution of the privilege claims in the Colorado district court."   Plaintiff filed a

Reply in support of his Motion to Compel (doc. #132) on May 20, 2014.   Defendant then filed a

notice (doc. #133) of the order issued by the Southern District of Florida granting Oxbow's Motion

to Quash.[7]

## ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) allows parties to "obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense."   Relevancy is broadly

construed and discovery should be permitted if there is "any possibility" that the information sought

may be relevant to the claim or defense of any party.   *See, e.g., Sheldon v. Vermonty*, 204 F.R.D.

679, 689-90 (D. Kan. 2001).   *But see Johnson v. Kraft Foods North America, Inc*., 238 F.R.D. 648,

653 (D. Kan. 2006) (when a discovery request is overly broad on its face or when the relevancy of

the discovery request is not readily apparent, the party seeking discovery has the burden of showing

---

[7] In granting Oxbow's Motion to Quash, Magistrate Judge Snow in the Southern District of
Florida found that "final resolution concerning whether the crime-fraud exception applies to
Koch's assertion of privilege will not resolve the issue of whether the same exception applies
with respect to Oxbow."   *See* doc. #133-1.

the request's relevance).  However, as the Advisory Committee Notes make clear, "the parties and the court [should] focus on the actual claims and defenses involved in the action."  *See* Advisory Committee Notes to the 2000 Amendment to Fed. R. Civ. P. 26(b)(1).  Subsumed within the scope of discoverable information under Rule 26(b)(1) is "information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses."  *Id.*

Although the scope of discovery under Rule 26(b)(1) is broad, it is not unlimited.  So for example, the court is required to limit the frequency or extent of discovery if it concludes, *inter alia*, that the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in discovery, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."[8]  *See* Fed. R. Civ. P. 26(b)(2)(C).  The Federal Rules of Civil Procedure also permit a court to restrict or preclude discovery when justice requires in order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.  *See* Fed. R. Civ. P. 26(c).

To prove his case at trial, Mr. Martensen must show by a preponderance of the evidence that: (1) Defendant Koch intended to restrict Plaintiff's freedom of movement;[9] (2) that Defendant Koch, directly or indirectly, restricted Mr. Martensen's freedom of movement for a period of time, no matter how short; and (3) that Plaintiff was aware that his freedom of movement was restricted.  *See* CJI-Civ. 21:1 (2013); *see also Goodboe v. Gabriella*, 663 P.2d 1051, 1055-56 (Colo. App. 1983).

---

[8]The court has comparable authority to exclude relevant evidence at trial where its probative value is outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.  *See* Fed. R. Evid. 403.

[9]A defendant's intent to restrict the plaintiff's freedom of movement "exists even if a person acts without malice or ill will or acts under a mistaken belief that he or she is privileged to restrict the other's freedom of movement."  *See* CJI-Civ. 21:3 (2013).

To prove his prima facie case, Mr. Martensen is not required to show that his detention was unlawful, the motivation underlying Defendant's actions, or that Mr. Koch's actions were unjustified. *Cf. White v. Pierson*, 533 P.2d 514, 516 (Colo. App. 1974) (holding that in an action for false arrest, the issue of legal justification is a substantive matter of affirmative defense). To recover exemplary damages, Mr. Martensen must prevail on his single claim and also show, beyond a reasonable doubt, that Defendant Koch "acted in a malicious or willful and wanton manner in causing Plaintiff's injuries or damages. *See* CJI-Civ. 5.4 (2013).[10]

Consistent with Rule 26(b)(1), Mr. Koch's affirmative defenses also define the scope of permissible discovery in this case. First, Mr. Koch claims in his Seventh and Thirteenth Defenses that even if Plaintiff was improperly detained, Defendant is not liable due to Plaintiff's theft and fraudulent activities. Defendant presumably wishes to argue that his actions were justified by Mr. Martensen's prior wrongful conduct. *Cf. Beckwith v. Bean*, 98 U.S. 266, 277 (1878) (in a case involving allegations of false imprisonment, noted "there is a vast difference between the criminality of a person acting mistakenly from a worthy motive, and one committing the same act from a wanton and malignant spirit, and with a corrupt and wicked design;" held that "any evidence that would show this difference, or rather all the facts and circumstances which tend to explain or disclose the motives and design of the party committing the wrongful act, are evidence which should

---

[10]*See also Qwest Services Corp. v. Blood*, 252 P.3d 1071, 1081 (Colo. 2011) (C.R.S. § 13-21-102(1)(b) defines willful and wanton conduct as "conduct purposely committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff"); *Juarez v. United Farm Tools, Inc.*, 798 F.2d 1341, 1342 (10th Cir. 1986) (noting that Colorado courts have construed the exemplary damages statue to "mean that an award of punitive damages is justified when the defendant acted 'with an evil intent, and with the purpose of injuring the plaintiff, or with such a wanton and reckless disregard of his rights as evidence a wrongful motive'").

go to the jury for their due consideration"). To the extent that Mr. Koch wishes to portray his actions as driven by a worthy or proper motivation, Mr. Martensen should be allowed to present the jury with an alternative motive, *i.e.,* that Mr. Koch was intent on silencing or intimidating an employee who had questioned the legality of Oxbow's tax re-structuring.[11] Defendant further claims in his Twelfth Defense that he was neither "directly or indirectly" involved in any alleged unlawful conduct. Yet, Mr. Koch has testified that he participated in numerous meetings to plan the confrontation at Bear Ranch, discussed those plans with several of his attorneys and executives, and was present at the ranch on March 22, 2012. Mr. Koch also contends in his Eighteenth Defense that Mr. Martensen has not alleged any conduct on his part that could be considered malicious or willful and wanton.

As previously noted, Rule 26(b)(1) requires production of nonprivileged materials relevant to a party's claims or defenses. Privileges further the administration of justice and "should not be set aside lightly." *See Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002). However, privileges also serve to withhold relevant information from the finder of fact and for that reason should be narrowly construed. *See Montgomery v. Leftwich, Moore & Douglas,* 161 F.R.D. 224, 225 (D.D.C. 1995). Where, as in this case, subject matter jurisdiction is premised on diversity, the court must apply Colorado's law governing attorney-client privilege. *White v. American Airlines, Inc.*, 915 F.2d 1414, 1424 (10th Cir. 1990) ("In a civil action based upon a state cause of action, state law controls the determination of privileges.").

The attorney-client privilege extends only to confidential matters communicated between

---

[11]Of course, no party has a right to introduce evidence that would be unduly prejudicial, confuse the issues, mislead the jury or waste time. *See* Fed. R. Evid. 403.

the attorney and his or her client in the course of receiving counsel, advice, or direction with respect to the client's rights or obligations. *See, e.g., A. v. Dist. Court of Second Judicial Dist.*, 550 P.2d 315, 327 (Colo. 1976), *cert denied*, 429 U.S. 1040 (1977); *Losavio v. District Court*, 533 P.2d 32, 35 (Colo. 1975). Under the common law, "a critical component of the privilege 'is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence.'" *In re Qwest Communications International, Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (quoting *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1985)).

The work product doctrine exempts from discovery "documents and tangible things . . . prepared in anticipation of litigation or for trial," Fed. R. Civ. P. 26(b)(3)(A),[12] and is intended to provide a lawyer "with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). In that respect, the work product doctrine is not a privilege within the scope of Fed. R. Evid. 501, but rather "a tool of judicial administration" that furthers the goals of fairness and convenience. *Pete Rinaldi's Fast Foods, Inc. v. Great American Insurance Companies*, 123 F.R.D. 198, 201 (M.D.N.C. 1988). The doctrine does not protect materials prepared in the "ordinary course of business." *Western Nat'l Bank v. Employers Ins. of Wausau*, 109 F.R.D. 55, 57 (D. Colo. 1985). "A document is protected by the work product privilege if it was prepared in anticipation of litigation by another party or that party's representative, and was intended to remain confidential." *Aull v. Cavalcade Pension Plan*, 185

---

[12]*See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998) ("Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3).") (quoting *United Coal Companies v. Powell Construction Co.*, 839 F.2d 958, 966 (3rd Cir. 1988)).

F.R.D. 618, 624 (D. Colo. 1998).

> Documents prepared in anticipation of litigation are those that "in light of the nature of the document and the factual situation in the particular case . . . can fairly be said to have been prepared or obtained because of the prospect of litigation."  Thus, documents that were prepared in the ordinary course of business or that "would have been created in essentially similar form irrespective of the litigation" are not protected by the work product doctrine.

*Weber v. Paduano*, No. 02 Civ. 3392(GEL), 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003) (internal citations omitted).  *Cf. Sandra T.E. v. South Berwyn School District 100*, 600 F.3d 612, 622 (7th Cir. 2009) (work product protection applies to "attorney-led investigations when the documents at issue 'can fairly be said to have been prepared or obtained because of the prospect of litigation'").

Both the attorney-client privilege and the work product doctrine provide protections for the client.  *Cf. In re Grant Jury Subpoenas,* 561 F.3d 408, 411 (5th Cir. 2009) (noting that work product protections belong to both the client and the attorney, and either may invoke those protections); *Bovino v. MacMillan*, __ F. Supp. 2d __, No. 12-cv-00551-PAB-MEH, 2014 WL 1128512, at *5 n.6 (D. Colo. Mar. 20, 2014) (the attorney-client privilege belongs to the client).  A client impliedly waives the attorney-client privilege by placing privileged communications or material at issue or by disclosing the privileged information to a third party.  *Accord People v. Sickich*, 935 P.2d 70, 73 (Colo. App. 1996) ("[B]ecause defendant put in issue what advice he did or did not receive from counsel, as well as his own understanding of the proceedings, he waived the attorney-client privilege with respect to his discussions with counsel on these topics.").  Moreover, "a litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion." *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998).  The party seeking to overcome the attorney-client privilege carries the burden of establishing a waiver or an

14

exception. *Wesp v. Everson*, 33 P.3d 191, 198 (Colo. 2001).

The attorney-client privilege and work product protection are vitiated by the crime-fraud exception when the communications between a client and attorney are made for the purpose of furthering a crime. *Ryskamp v. Looney*, No. 10-cv-00842-WJM-KLM, 2011 WL 3861437, at *9 (D. Colo. Sept. 1, 2011) (citing *A. v. Dist. Court of Second Judicial Dist.*, 550 P.2d at 324). *See also In re Grand Jury Subpoenas v. United States*, 144 F.3d 653, 660 (10th Cir. 1998) (citing *In re Grand Jury Proceedings (Vargas)*, 723 F.2d 1461, 1467 (10th Cir. 1983)) (recognizing that the crime-fraud exception applies to both the attorney-client privilege and the work product doctrine).

The party invoking the crime-fraud exception must present a prima facie showing of "facts 'adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception to the attorney-client privilege has occurred.'"[13] *People v. Tucker*, 232 P.3d. 194, 199 (Colo. App. 2009) (quoting *Caldwell v. District Court in and for City & County of Denver*, 644 P.2d 26, 33 (Colo. 1982)). The Tenth Circuit has not articulated the precise requirements for establishing a prima facie showing; however, the party opposing the privilege must present evidence that the allegation of attorney participation in the crime has some foundation in fact. *See In re Grand Jury Subpoenas*, 144 F.3d at 660; *see also In re Grand Jury Proceedings (Vargas)*, 723 F.2d at 1467. Other circuits require a similar showing.[14] The movant

---

[13]*Cf. In re Piercen's Estate*, 195 P.2d 725, 726 (Colo. 1948) ("prima facie evidence means evidence which is sufficient to establish the fact, unless rebutted – evidence which, standing alone and unexplained, would maintain the proposition and warrant the conclusion to support which it is introduced").

[14]*See United States v. Martin*, 278 F.3d 988, 1001 (9th Cir. 2002) ("reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme."); *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) (evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud); *In re Grand Jury*

may satisfy his burden by presenting documentary evidence or testimony that is already in the record.  *See In re Grand Jury Proceedings (Vargas)*, 723 F.2d at 1467.  When a movant has presented competent evidence, the party seeking to protect the privilege must then come forward with rebuttal evidence.  *See United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993) (holding that a party has established a prima facie case under the crime-fraud exception "whenever it presents evidence sufficient 'to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come forward with that explanation'").  A determination of whether the movant has satisfied his burden lies in the discretion of the court.  *In re September 1975 Grand Jury Term*, 532 F.2d 734, 737 (10th Cir. 1976).

The movant must provide evidence that the privileged communication is reasonably related to and in furtherance of the crime.  Courts have applied varying standards for a sufficient showing, but the evidence must demonstrate that the client was engaged in or was planning the criminal conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it.  *See In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987).  The necessary showing does not require that the attorney from whom the client received advice was a knowing participant in the crime or otherwise culpable.  *See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (attorney-client "communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of . . . an improper cause.").

---

*Proceedings (Appeal of Corporation)*, 87 F.3d 377, 381 (9th Cir. 1996) (invocation of crime-fraud exception required reasonable cause to believe attorney was used in furtherance of ongoing scheme); *In re International Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982) (evidence such as will suffice until contradicted and overcome by other evidence).

16

The crime of false imprisonment in Colorado requires that a person knowingly confine or detain another without the other's consent and without proper legal authority. C.R.S. § 18-3-303(1). False imprisonment is a class 2 misdemeanor but becomes a class 5 felony if the perpetrator uses force or threat of force to confine or detain the other person, and the other person is confined or detained for twelve hours or longer. C.R.S. § 18-3-303(2). Although criminal false imprisonment expressly requires that confinement happen without the detainee's consent, lack of consent is implicitly required for the tort. *See*, *e.g., Blackman for Blackman v. Rifkin*, 759 P.2d 54, 58 (Colo. App. 1988) (The tort of "[f]alse imprisonment is an unlawful restraint upon a person's freedom of locomotion, or the right to come and go when or where one may choose") (internal citation omitted); 1 F. Harper & F. James, *The Law of Torts* § 3.7 (O. Gray 2d ed. 1986) ("[T]o confine one intentionally without lawful privilege and against one's consent within a limited area for any appreciable time, however short, constitutes the tort of false imprisonment."). Therefore, the elements necessary for the crime of false imprisonment are virtually identical to the elements constituting the tort of false imprisonment.

A.  *Plaintiff's Motion to Compel Deposition Testimony*

Mr. Martensen seeks an order compelling Defendant Koch to answer deposition questions directed to the events at Bear Ranch and Oxbow's tax restructuring.  Specifically, Plaintiff seeks substantive responses to the following questions:

1.  What was the strategic planning in which Mr. Bell was involved relating to the March 21 and 22, 2012 events?  (Koch Deposition, at 73:13).

2.  Did you discuss with Mr. Bell the fact that you were going to be bringing [Plaintiff] and Mr. Black and Mr. Zahn up to Bear Ranch without informing them that they were going to be terminated?  (Koch Deposition, at 75:12).

3.  Did Defendant and Mr. Beyer create a script for Mr. Black's interview?  (Koch Deposition, at 86:17).

4.  With respect to [the tax in question], there was a time when you made a business decision to transfer and direct your agents in Oxbow to transfer a bunch of contracts to the Bahamian subsidiary, such that Matt Frielig would have to approve these agreements after April 1 of 2010, right?  (Koch Deposition, at 167:21-168:1).

5.  Who was responsible for deciding who would conduct Plaintiff's interview?  (Koch Deposition, at 226:19).

6.  Are you aware that [following the tax reorganization] Oxbow Carbon was presenting to Oxbow International all opportunities to sell material, which meet these criteria which are enumerated beginning on or about April the 1st of 2010?  (Koch Deposition, at 233:2-6).

7.  Did you make the decision [following the tax reorganization] to implement the program of transferring contracts on or about April the 1st, 2010?  (Koch Deposition, at 235:4-6).

The events at Bear Ranch certainly are relevant to Plaintiff's affirmative case and his request for punitive damages.  The Rule 26(b)(1) relevance standard subsumes deposition questions that seek to elicit information shedding light on Mr. Koch's affirmative defenses and, more specifically, his participation in and motivation for planning and implementing the Bear Ranch confrontation.

The Revised Fourth Amended Complaint also alleges that prior to the events at Bear Ranch,

"Koch learned that Martensen and other Oxbow employees expressed . . . concern about the legality of Oxbow's tax avoidance strategy" and that Defendant orchestrated the meeting at Bear Ranch "in order to discredit, demoralize and deter Plaintiff from acting as a witness and/or IRS whistleblower against him."  *See* doc. # 111 at ¶¶ 22 and 25.  During his deposition on December 12, 2013, Defendant Koch was asked about Mr. Martensen's "expressions of concern" regarding Oxbow's tax restructuring.

> Q:  Do you recall that during the course of the investigation of Mr. Martensen and Mr. Black and Charlie, you saw correspondence emails where Kirby was expressing serious concerns about the legality of this transfer of the income producing contracts with the Asian customers?

> A:  I've never seen one of those emails, and I doubt one exists. If you have one, please show it to me.

> Q:  So you never learned that Mr. Martensen and others who worked for Oxbow were concerned that they were involved in a conspiracy to you to violate the intra (sic) revenue laws based on what they were directed to do?

> * * *

> A:  I think that's all BS and it's made up of after the fact. The only thing I was aware of is that Kirby and Larry were upset because it might—whatever we did overseas, might reduce their gross profit of their so-called little fiefdom and they be paid less bonus. That's the only thing I heard. He was whining about that.

> Q:  So it's your testimony that you were never aware prior to Mr. Martensen's accusations in the lawsuit that we're here on, that he was concerned about possibly being involved in tax evasion for Oxbow?

> * * *

> A:  I told you, that's BS.[15]

---

[15]Counsel's preliminary question focused on e-mail communications in which Mr. Martensen expressed concerns about Oxbow's tax restructuring.  Although Mr. Koch denied ever seeing such e-mails, his answer did not disclaim any and all knowledge, from whatever source, of Mr. Martensen's alleged concerns.  I am not convinced that the above-cited deposition passage

*See* Koch Deposition, at 168:18-25 and 169:1-22.[16]

In view of the allegations in the Revised Fourth Amended Complaint, Plaintiff should be permitted to explore whether or to what extent Mr. Koch was aware of tax concerns raised by Mr. Martensen, directly or indirectly, prior to March 21-22, 2012.  This information also could serve to refute Defendant's affirmative defenses or impeach his credibility.  However, depositions questions that generally seek information regarding Oxbow's tax restructuring sweep too broadly and do not have a sufficient nexus to the claim and defenses in this case.  Tax concerns or allegations of tax improprieties that Mr. Martensen raised or alleged after the incident at Bear Ranch and his termination from Oxbow, or that he expressed to others but were never brought to Mr. Koch's attention, could not have influenced Defendant's actions on or before March 21-22, 2012, and thus would be irrelevant to Plaintiff's alleged false imprisonment.

Mr. Koch declined to answer questions pertaining to planning for the Bear Ranch confrontation on the basis of attorney-client privilege because Mr. McAuliffe and Mr. Callahan

---

forecloses all further inquiry on this subject.

[16]Plaintiff continues to assert that he has come forward with facts to establish a prima facie showing of tax fraud and satisfy the crime-fraud exception as to that alleged offense.  I remain convinced that Plaintiff has not made the required showing.  For example, in addition to Mr. Koch's deposition transcript, this court has been provided with deposition testimony given by Lawrence Black, Mr. Martensen's former supervisor and colleague at Oxbow.  In response to questioning by Defendant Koch's attorney, Mr. Black acknowledged that Oxbow employees had expressed concern about the legality of Oxbow's tax avoidance strategy.  *See* Transcript of the Videotaped Deposition of Lawrence Black on June 25, 2013, at 192:2-7.  However, during his deposition, Mr. Black conceded that he was not qualified to render an opinion as to whether Oxbow's tax structure in 2010 was legal.  Indeed, Mr. Black testified that he didn't believe that Oxbow's tax structure was illegal.  As for Plaintiff's stated concerns, Mr. Black recalled that Mr. Martensen's "concern was that he would move his family to Singapore and all the sudden the IRS would find that the situation – or the setup in the Bahamas had to be folded up and he would be stuck in Singapore after he just moved his young family there."  *Id.* at 199:3-8 and 19-24. and 200:15-21.

"provide[d] legal advice related to the investigation and interviews of the executives whom Oxbow considered terminating for misconduct," and offered "legal advice related to Oxbow's rights and obligations as to those employees, as well as 'with regard to potential or expected litigation' by or against Oxbow." *See* doc. #88 at p. 6.   Defendant Koch testified that the following individuals participated in the planning sessions in addition to Messrs. McAuliffe and Callahan:  Timothy Beyer (attorney), Roy Bell (attorney), Harry Najim (attorney), David Nestler (Oxbow Carbon executive vice-president), Steve Fried (Oxbow Carbon senior executive), Jim Elroy (independently contracted by Oxbow Carbon), and Rob Gill (manager of Bear Ranch).[17]  *See* doc. #98 at p. 2.  Based on that testimony, this court finds that Mr. Koch's planning conferences with counsel in advance of the Bear Ranch event are privileged.

Plaintiff claims that if these discussions are protected by the attorney-client privilege, Defendant Koch waived the privilege by receiving legal advice in the presence of non-attorneys. Defendant argues in response that "[e]very non-attorney individual whom [I] testified was present at the 'discussions' and 'meetings' was a corporate employee, independent contractor, or agent of Oxbow." *See Alliance Constr. Solutions, Inc. v. Dep't of Corr.*, 54 P.3d 861, 869-70 (Colo. 2002) (finding no principled reason to distinguish between an independent contractor or consultant and an employee for purposes of the attorney-client privilege).  Indeed, the four non-attorney participants involved in the strategy sessions were two Oxbow executives, an independent contractor affiliated with Oxbow, and an employee of Defendant.  Accordingly, Plaintiff has not demonstrated that Defendant Koch waived the privilege. *See Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court*,

---

[17]Defendant Koch also believed that a representative of "one or two other law firms" may have been present during the meetings. *See* doc. #98-1 at p. 40.

718 P.2d 1044 (Colo. 1986) (the attorney-client privilege protects communications between corporate employees and officers and the corporation's legal counsel). *Cf. Markwest Hydrocarbon, Inc. v. Liberty Mutual Ins. Co.*, No. 05-cv-01948-PSF-PAC, 2007 WL 1106105, at *4 (D. Colo. April 12, 2007) (the attorney-client privilege protects communications where "the information-giver is an employee, agent, or independent contractor with a significant relationship to both the entity and the transaction that is the subject of the entity's need for legal services.") (citing *Alliance Constr. Solutions, Inc.*, 54 P.3d at 869).

Plaintiff also argues that the crime-fraud exception should apply to otherwise privileged discussions held to plan the March 21-22, 2012 event at Bear Ranch. Plaintiff's false imprisonment claim survived a motion to dismiss in the Northern District of California and draws some support from Mr. Koch's acknowledgment under oath that cellular and internet service were purposefully restricted at Bear Ranch, a personal security detail patrolled the property, a uniformed Sheriff's Deputy was present, and Plaintiff was driven to an airport outside of Denver when he was scheduled to fly out of Aspen.[18] *See United States v. Mower*, 2004 WL 2348067, at *3 (for purposes of the crime-fraud exception, "[r]easonable cause is more than suspicion but less that [sic] a preponderance of evidence"). Accordingly, I find that Plaintiff has presented a prima facie showing of facts to support a reasonable belief that wrongful conduct occurred.[19]

---

[18]Defendant Koch testified, to the contrary, that his guests at the Bear Ranch event "were free to leave any time they wanted" and "if they had said . . . I want to get out of here, we would have taken them to the nearest place where they could have gotten public transportation." *See* Koch Deposition, at 208:18-19, 209:23-5 and 210: 1-2.

[19]Defendant argues that Plaintiff has not met the required threshold, citing the Colorado Bureau of Investigation's inquiry into whether Plaintiff was falsely imprisoned and/or kidnaped during the weekend of March 21, 2012. The District Attorney's Office for Colorado's Seventh Judicial District declined to press charges after an independent investigation. While "the exercise of

Defendant Koch testified that he held numerous meetings and discussions to plan the Bear Ranch event (doc. #98-1 at p. 8), and that he sought and received legal advice from several of his attorneys[20] during these meetings.  *See, e.g.*, Koch Deposition, at 74:25-76:9 and 77:20-78:9. Additionally, Defendant discussed the logistics of the March 22, 2012 interviews at strategy meetings attended by Messrs. Callahan, McAuliffe, Bell, Beyer, and Najim, and attorneys from the law firm Latham & Watkins.  *See* doc. #98-1 at p. 40.  Mr. Koch testified that Mr. Bell and Mr. Beyer were personally involved in the interviews.  *Id.* at p. 11; Koch Deposition at 79:11-20 and 87:12-15.

At this stage, my inquiry is narrow and considers only whether Plaintiff has presented prima facie evidence sufficient to support the crime fraud exception.  *See Lee v. State Farm Mutual Automobile Insurance Co.*, 249 F.R.D. 662, 680 (D. Colo. 2008) ("A prima facie showing exists where the plaintiff raises a reasonable inference…") (quoting *First Horizon Merchant Services, Inc. v. Wellspring Capital Management, LLC*, 166 P.3d 166, 173 (Colo. App. 2007)).  This court need not decide whether Mr. Martensen can prove his claim at trial by a preponderance of the evidence.  *See Davis*, 1 F.3d at 609 ("'prima facie evidence' [does] not mean 'enough to support a verdict in

---

prosecutorial discretion is at the very core of the executive function," *In re Grant Jury Subpoena, Judith Miller*, 397 F.3d 964, 976 (D.C. Cir. 2005), prosecutorial decision-making may be influenced by many factors that do not bear on the existence of probable cause or the weight of the evidence.  *See, e.g., Wayte v. United States*, 470 U.S. 598, 607 (1985) (noting that prosecutorial discretion may be guided by various factors such as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement priorities").  Defendant Koch has not directed this court to any judicial precedent holding that "prosecutorial discretion" trumps this court's independent responsibility to fairly apply the law governing civil discovery and privilege. The court is not aware of any case holding that I should abdicate my responsibilities in favor of a local prosecutor's discretion.

[20]Specifically, Messrs. Callahan, McAuliffe, and Bell.

favor of the person making the claim'"").   While the applicability of the crime-fraud exception presents a close question under the facts of this case, the balance must be struck in favor of allowing discovery to effectuate the full extent of the truth-seeking process.  *See Nat'l Farmers Union Prop. & Cas. Co.*, 718 P.2d at 1046 (citing Colo. R. Civ. P. 26(b)(1)) (further internal citation omitted). I find that Plaintiff's allegations regarding his confinement between March 21 and March 22, combined with Defendant Koch's deposition testimony are sufficient to meet his threshold burden under the crime-fraud exception.   Mr. Koch will be required to answer pertinent questions at a re-opened deposition.

B.        *Plaintiff's Motion to Compel Production of Documents*

Plaintiff's motion seeks production of reports generated by Grant Thornton and referenced in Defendant Koch's deposition; documents that delineate the planning for the Bear Ranch confrontation; the video and audio recordings of interviews held that weekend; and Defendant Koch's notes pertaining to one particular interview.   Plaintiff also seeks specific evidence of his allegedly fraudulent dealings, the names of each consultant listed in Defendant's privilege log, and information regarding Oxbow's business strategy in China.   In additional to disputing their relevance, Defendant Koch argues that the materials sought by Mr. Martensen's motion to compel are subject to the attorney-client privilege, the work product doctrine, or both.

1. <u>The Grant Thornton Reports</u>

Defendant Koch referenced the Grant Thornton investigation and related reports during his

deposition.

> Q:  Okay. And when did this planning [for the Bear Ranch events] begin,
> what was the first meeting that you could recall where you began planning this
> 48-hour adventure?

> \* \* \*

> A:  I cannot specify an exact date.

> \* \* \*

> A:  . . . . [T]here was a continuum of investigation going on for a number, a
> period of time, and I just do not know when we decided to have a meeting and a
> confrontation.

> Q:  This continuum of investigation to which you just testified, when did the
> continuum begin?

> A:  February of 2011.

> Q:  And what happened in February of 2011 that caused this continuum to
> begin?

> A:  I got an unsigned letter in the mail saying that there was extreme
> corruption going on in our China office, and Larry Black and Kirby Martensen
> were in it, involved in it heavily, and had secret bank accounts.

> \* \* \*

> Q:  You did a fairly extensive investigation, correct?

> A:  Yes.

> \* \* \*

> Q:  Mr. Koch, did you receive one or more summaries or reports of this
> investigation that you talked about earlier that began sometime in February 2011?
> . . . Did you receive any written reports?

A:  Yes.

Q:  And from whom did you receive these reports?

A:  The reports went from our investigators to our attorneys and then came to me.

Q:  Okay. And who are your investigators?

A:  Grant Thornton was the main investigator or the meat grinder . . .  They did 90 percent or 95 percent of the work or maybe 99 percent of it.

\* \* \*

Q:  Over what period of time were you receiving written reports from Grant Thornton?

A:  Probably, I'd forgotten exactly when we first started receiving the reports because it took a while to gather the information or the documents to give to Grant Thornton. It took them awhile to analyze them. And that was an ongoing thing, gathering and analyzing, etc.  And with all the huge number of documents, it took them some period of time, so I would guess six months later after we started the investigation we started getting reports, but that's a guess. And I might get them on a particular subject or I could get them once a month or I only remember three or four reports.

\* \* \*

Q:  When did the plans to actually bring all these individuals to Bear Ranch begin? When did you decide that you wanted to have this confrontation?

\* \* \*

A:  I'm having a real hard time because it goes to the continuum of investigation.  I think the idea of having a strategic meeting which we usually do, and having the review meetings which we usually do to review a particular division's performance and combining that with confronting these guys and asking them for their explanation.  So what we found out and what went on, that may have occurred within three months, two months, I just don't remember.

Q:  Your best estimate though it was two or three months before March 21st of 2012 when you had reached the decision that you were going to have a confrontation over what you found from the investigation?

26

* * *

A:  It was sometime in there but I can't, I can't pin the date down.

*See* Koch Deposition, at 26:2-6, and 24-25; 27:4-12; 43:4-6; 68:2-15; 70:18-25; 71:1-6; 80:3-25; 81:1.

Having never seen the Grant Thornton reports, I do not know if they contain specific findings relative to Mr. Martensen and, if so, whether those findings are based on hard facts, circumstantial evidence, or speculation alone.  I also do not know if the Grant Thornton reports make mention of Oxbow's tax re-structuring or any tax concerns expressed, directly or indirectly, by Mr. Martensen or any other Oxbow employee.

It appears, however, that these reports were generated in connection with an investigation of allegations that Plaintiff was defrauding Oxbow.  Apparently these reports were provided to Mr. Koch and played some part in his decision to confront Mr. Martensen at Bear Ranch. The Grant Thornton investigation and reports are relevant to the extent that Mr. Koch's own testimony suggests that they are integrally related to the affirmative defense that Mr. Martensen was "self-dealing and participat[ing] in a fraudulent scheme against the Oxbow Companies" and the affirmative defense that Defendant was "legally justified and/or privileged" in detaining Plaintiff on March 21-22, 2012. For purposes of the instant motions, I am not required to draw any conclusions as to the admissibility of this evidence at trial.  Mr. Martensen should be permitted to discover relevant non-privileged materials unless "it is clear that the information sought can have no possible bearing" on the claims and defenses in the case. *Echostar Satellite, LLC v. Splash Media Partners, L.P.*, Civ. No. 07-cv-02611-PAB-BNB, 2009 WL 1328226, at *4 (D. Colo. May 11, 2009) (citing *Johnson*, 238 F.R.D. at 653).  Based on the available record, I will require Defendant to produce those

27

portions of the Grant Thornton reports that refer to Mr. Martensen or address Plaintiff's alleged participation in a scheme to defraud or disadvantage Oxbow.  In addition, I will require Defendant to provide those portions of the Grant Thornton reports, if any, that address or reference any concerns attributed to Mr. Martensen relating to Oxbow's tax re-structuring or improper tax avoidance.

Defendant Koch argues that the Grant Thornton reports are not discoverable, either because they are work product under Fed. R. Civ. P. 26(b)(3)(A) or because they reflect facts known and opinions held by not testifying experts under Fed. R. Civ. P. 26(b)(4)(D).  The Grant Thornton investigation was commissioned in 2011, at the direction of Oxbow's then-general counsel, Mr. Callahan, to assess the veracity of an anonymous letter.  Oxbow "sought to determine whether it had been defrauded, whether it had claims against one or more persons, and the extent of its damages." *See* doc. #117 at p. 8 and doc. #119.  *Cf. California Earthquake Authority v. Metropolitan West Securities, LLC*, 285 F.R.D. 585, 590-92 (E.D. Cal. 2012) (held that documents prepared by an outside accounting firm in connection with an investigation and analysis of plaintiff's investment losses were entitled to work product protection because of their close relationship to potential litigation); *Kellogg USA, Inc. v. B. Fernandez Hermanos, Inc.*, 269 F.R.D. 95, 100 (D. P.R. 2009) (while documents in question may have been prepared for both a business and litigation purpose, held that work product protection was appropriate where the company understood that its decision-making process would likely result in litigation and involved its attorneys in the evaluation process).  Mr. Koch insists that Oxbow typically does not engage in internal audits or investigations of this kind.  *See* doc. #117 at p. 8 and doc. #119.

Based upon the foregoing, I find that the Grant Thornton reports were prepared in anticipate of litigation that was reasonably foreseeable and, therefore, constitute protected work product. *Cf. Quinn Construction, Inc. v. Skanska USA Building, Inc.,* 263 F.R.D. 190, 193 (E.D. Pa. 2009) (holding that a report prepared by defendant's outside consulting firm was entitled to work product protections where the report was prepared at the direction of counsel in anticipation of litigation and was intended to be used to guide litigation strategy). *See also Ager v. Jane C. Stormont Hospital and Training School for Nurses*, 622 F.2d 496, 501 (10th Cir. 1980) (listing factors to consider in determining the status of an expert including "the manner in which the consultation was initiated," and "the nature, type and extent of information or material provided to, or determined by, the expert in connection with his review"). Alternatively, I conclude that the Grant Thornton reports represent "facts known or opinions held by" a non-testifying expert retained or specially employed in anticipation of litigation under Rule 26(b)(4)(D). However, these findings are not dispositive of Plaintiff's request for production of these documents.

Fact work product is discoverable where the moving party can demonstrate a "substantial need for the materials to prepare its case" and an inability to obtain "their substantial equivalent by other means" without undue hardship.[21] *See* Fed. R. Civ. P. 26(b)(3)(A)(ii). Moreover, facts known or opinions held by a non-testifying expert may be discoverable "on showing exceptional circumstances under which it is impracticable for the [moving] party to obtain facts and opinions on the same subject by other means." *See* Fed. R. Civ. P. 26(b)(4)(D)(ii). Mr. Martensen bears the

---

[21]"A substantial need exists where 'the information sought is essential to the party's defense, is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." *Nevada v. J-M Manufacturing Company, Inc.*, 555 Fed. Appx. 782, 785 (10th Cir. 2014) (quoting *National Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)).

burden of demonstrating "substantial need" or "exceptional circumstances." *See, e.g., Hallmark Cards, Inc. v. Murley*, No. 09-0377-CV-W-GAF, 2010 WL 4608678, at *6 (S.D.N.Y. Nov. 9, 2010) (in sustaining its burden of demonstrating "substantial need," the requesting party cannot rely on conclusory statements or leave it to the court "to make the connection between its litigation claims . . . and its 'substantial need'" for the documents in question); *U.S. Inspection Services, Inc. v. NL Engineered Solutions, LLC*, 268 F.R.D. 614, 617 (N.D. Cal. 2010) (noting that the party "seeking discovery from a non-testifying expert carries a heavy burden of proving the existence of exceptional circumstances").

Plaintiff's motion does not attempt to satisfy either the "substantial need" or "exceptional circumstance" standard. That discrepancy is all the more remarkable given the particular circumstances of this case. Defendant Koch's deposition testimony indicates that the Grant Thornton reports he received played a significant role in the decision to plan and carry out the Bear Ranch confrontation with Mr. Martensen. Even if Mr. Martensen could today independently replicate the Grant Thornton investigation (a process that would be both time-consuming and expensive), the results of that *post hoc* investigation might bear little similarity to the information that Mr. Koch received in 2011, and Defendant Koch's affirmative defenses presumably are based on the information that he had prior to March 21-22, 2011. *Cf. Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, 244 F.R.D. 412, 424 (N.D. Ill. 2006) (finding that plaintiffs had established "substantial need" for purposes of Rule 26(b)(3) and were entitled to discover fact work-product in documents relating to a compliance study conducted by an accounting firmed retained by in-house counsel; the court found that the information could assist plaintiffs in establishing elements of their claims and plaintiffs did not have the underlying data utilized by the accounting

firm in preparing its study); *State of Florida ex rel. Butterworth v. Industrial Chemicals, Inc.*, 145 F.R.D. 585, 588 (N.D. Fla. 1991) (holding that even if the state's civil investigation materials were protected by the work product doctrine, movant established substantial need and undue hardship where the documents in question contained evidence upon which the state based its antitrust complaint and it would be extremely difficult, not to mention "wasteful" for the movant to replicate that investigation).

Notwithstanding the brevity of Plaintiff's arguments, I find that Defendant Koch's affirmative defenses compel production of those portions of the Grant Thornton reports that were provided to Mr. Koch and that address Mr. Martensen's alleged wrong-doing and/or his views as to Oxbow's tax restructuring. "Both the attorney-client privilege and work product privilege may be waived if a party puts the privileged communications at issue by relying on it to support a claim or defense. Such a waiver 'may be implied in circumstances where it is called for in the interests of fairness.'" *Koumoulis v. Independent Financial Marketing Group, Inc., LPL*, 295 F.R.D. 28, 40-41 (E.D.N.Y. 2013) (suggesting that where an employer conducts an internal investigation in response to an employee's claim of discrimination and then puts the reasonableness of that investigation at issue by asserting an affirmative defense, the employer waives any privilege or protection that might otherwise apply to documents concerning that investigation). *Cf. Coastline Terminals of Connecticut, Inc. v. United States Steel Corp.*, 221 F.R.D. 14, 17 (D. Conn. 2003) (holding that waiver of work product protection may occur "when a party takes a position in a case that places at issue the very information sought to be protected from disclosure"). Similarly, '[a] litigant cannot use the work product doctrine as both a sword and a shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from

31

challenging the assertion." *Frontier Refining, Inc.*, 136 F.3d at 704.  *Cf. Frazier v. Board of County Comm'rs of Arapahoe County*, No. 08-cv-02730-WYD-BNB, 2010 WL 447785, at *1 (D. Colo. Feb. 3, 2010) ("waiver of the attorney client or work product privileges can occur when the privilege holder asserts a claim or affirmative defense which puts the privileged matter directly at issue."). *See also Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010) (holding that fundamental fairness precluded plaintiffs from using communications as a shield from production after wielding the conclusions from those communications as a sword).  To allow Mr. Koch to rely upon the Grant Thornton reports to plan for and justify the Bear Ranch confrontation and then withhold those same materials from Plaintiff would, in my opinion, effectively subvert the fact-finding process.

2.  Materials Related to the Bear Ranch Events

During his December 12, 2013 deposition, Defendant Koch referenced documents that he had prepared or received in connection with the planning that preceded the Bear Ranch meeting. These documents unquestionably are relevant to Plaintiff's claim of false imprisonment, particularly in light of Defendant's affirmative defenses.  Mr. Koch testified that his attorneys participated in the planning sessions held in advance of the Bear Ranch events and provided legal advice to the attendants, all of whom were affiliated with Oxbow, and therefore argues that any written memorialization of the plans relating to the Bear Ranch event is privileged.  However, for the reasons discussed above, the crime-fraud exception vitiates the privilege as to those planning documents.

Plaintiff also seeks audio and video recordings of five interviews, in addition to his own, that were conducted on March 22, 2012 at Bear Ranch.[22]  While not relevant to the elements underlying Plaintiff's false imprisonment claim, I cannot conclude that these records could have no possible bearing on Mr. Koch's affirmative defenses.  It is conceivable that one or more of these interviews elicited information that confirmed or refuted allegations involving Mr. Martensen, or called into question the findings or assumptions reflected in the Grant Thornton reports.  Also, because I do not know the scope or substance of these interviews, I cannot rule out the possibility that questions or answers could bear upon Mr. Martensen's "tax scam" theory.[23]

Defendant argues that the audio and video recordings of these five interviews are protected by the work product doctrine as surveillance tapes made in anticipation of litigation.  *See* doc. #117 at p. 17.  For support, Defendant cites cases that involve traditional surveillance footage of plaintiffs at the time the underlying events occurred.  *See*, *e.g., Fletcher v. Union Pac. R.R. Co.*, 194 F.R.D. 666, 670 (S.D. Cal. 2000); *Ford v. CSX Transportation, Inc.*, 162 F.R.D. 108, 111 (E.D.N.C. 1995); *Fisher v. National R.R. Passenger Corp.*, 152 F.R.D. 145, 147 (S.D. Ind. 1993)).  The March 22, 2012 recordings are better described as witness statements.  Defendant purposefully recorded and videotaped the interviews of these Oxbow executives.  *See* doc. #98-1 at pp. 28, 29.[24]

---

[22]Plaintiff has received the recordings of his own interview.  He claims that five other members of OCM International's west coast team, Larry Black, Charlie Zhan, Joe Lombardi, Bruce Taverner, and Rich Ansley, were brought to Bear Ranch, interviewed on tape, and terminated shortly thereafter on March 22, 2012.  *See* doc. #108 at p. 12.

[23]I am mindful that these interviews may touch on subjects that are wholly unrelated to the claim and defenses in this case, and may subject a non-party to annoyance, embarrassment or oppression.  I am not precluding a request for relief under Rule 26(c), conditioned of course on a particularized showing of good cause.

[24]As Mr. Koch explained during his deposition:

A review of the relevant case law reveals that courts are divided as to whether witness statements are protected work product. So, for example, in *Enos-Martinez v. Board of County Com'rs of the County of Mesa*, No. 10-cv-00033-WJM-DLW, 2012 WL 1079442, at *3 (D. Colo. Mar. 30, 2012), the court held that third-party affidavits were protected under the work product doctrine because they were "the end result of interviews conducted by Plaintiff's counsel in preparation for trial . . . [and] include opinion statements expressed by the third-party witnesses during the interviews." *Cf. Butler Manufacturing Co., Inc. v. Americold Corp.*, 148 F.R.D. 275 (D. Kan. 1993) (holding that a recorded statement that a third-party gave to defendant's investigator was "clearly work product" because it was taken in anticipation of litigation). Other courts have held, to the contrary, that third-party affidavits, even if prepared by counsel, "merely recite relevant facts within the affiants' personal knowledge rather than revealing an attorney's mental impressions or legal strategy." *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 422-23 (D. N.J. 2009) (although defendant may have secured these third-party statements in anticipation of litigation, "[Plaintiff] seeks no more than factual statements of these non-party witnesses. It should not be frustrated in its ability to test the perception and credibility of these persons"). *See also Murphy v. Kmart Corp.*, 259 F.R.D. 421, 428 (D. S.D. 2009) (required plaintiff to produce affidavits that he obtained from third-parties during the course of his investigation; these affidavits were not

---

Q:  Do you recall that monitors have been set up in this IT room for the town site just for these meetings?
A:  Yes.
Q:  And was this the first occasion when the information technology people had installed, concealed cameras and monitors right before this March 2012 get-together?
A:  … this was the first time we put them in the interview rooms.

Koch Deposition, at 200:13-16, 202:10-13 and 23-24.

protected under the work product doctrine; "what counsel are entitled to protect is *their* work and *their* thoughts and *their* analysis of the case, not the knowledge possessed by third parties") (quoting *Dodds v. Lamonts Apparel, Inc.*, 155 F.R.D. 650, 653 (D. Alaska 1994) (emphasis in original) and cases cited therein.[25]  I find that the requested interview tapes may contain relevant information and are not protected by the work product doctrine.  They should be produced.

Finally, Plaintiff requests the notes that Defendant Koch prepared for Mr. Black's interview. Once again, these notes are not relevant to Plaintiff's affirmative case because they have no bearing on whether Plaintiff was falsely imprisoned.  They are, however, relevant to Defendant's affirmative defenses for the same reasons the tape recordings are relevant.  Mr. Black was Plaintiff's supervisor; the notes could plausibly include information pertaining to Plaintiff's business practices or opinions regarding Oxbow's tax reorganization.

Defendant contends that he prepared his notes for Mr. Black's interview after consulting with his attorneys and therefore they are privileged.  *See* doc. #117 at p. 17.  Yet, Mr. Koch testified that he compiled an outline for the interview according to his own thought process and knowledge of Mr. Black.  *See* Koch Deposition, at 87:16-17 and 88:1-4 ("Q: And how did you go about formulating the questions [for Mr. Black]? … A: I had made some notes that I had worked out in my own head how I wanted to approach it, because I've known Larry very well, and so I followed that approach.").  Defendant's outline was a product of his own thoughts and strategy and is not protected by the work product doctrine.

---

[25]*See also People v. Martinez*, 970 P.2d 469, 475 (Colo. 1998) ("[witness statements] are work product only in the sense that they are compiled by the attorney; not in the sense that they contain the attorney's mental impressions or strategies.").

3. <u>Evidence of Plaintiff's Misconduct and Materials Related to Plaintiff's Transfer to Singapore</u>

Plaintiff seeks documentation of the "kickbacks" he purportedly received while employed by Oxbow and evidence of actual damages that Oxbow incurred as a result of his alleged misconduct. Mr. Koch asserts he has already produced the requested evidence of kickbacks and Oxbow's damages, and Plaintiff does not dispute receiving these materials. Based on those representations, I consider this particular item resolved.

Mr. Martensen also seeks spreadsheets prepared by Oxbow that track the amount of petroleum coke that Plaintiff sold to end-users in China and illustrate the company's lost profits, as well as seven documents withheld on the basis of privilege that discuss Mr. Martensen's transfer to Singapore. *See* doc. #108. The spreadsheets are an assessment of the damages caused by Plaintiff's alleged theft and fraudulent dealings, and are therefore not relevant to Plaintiff's claim for false imprisonment. Similarly, documents memorializing the decision to transfer Plaintiff to Singapore are not relevant to Plaintiff's affirmative case. However, the spreadsheets are relevant to Plaintiff's alleged misconduct, and the withheld Singapore documents could potentially demonstrate a link between Oxbow's tax reorganization and Plaintiff's transfer.

While agreeing that the spreadsheets were produced as part of an internal investigation, Mr. Martensen suggests that the documents nevertheless are discoverable because the spreadsheets were prepared in the normal course of business and not in anticipation of litigation, that any privilege or work-product protection was waived because Oxbow relied on these documents both in this case and the Florida action, or because the crime-fraud exception applies. Defendant Koch argues, to the contrary, the Oxbow spreadsheets are and remain protected fact work product. *See* doc. #117; Koch Deposition, at 51:20-59:23.

For purposes of the instant motion, I will assume, without deciding, that the disputed spreadsheets are fact work product. Nevertheless, for the same reasons articulated above, I find that the requested spreadsheets must be produced. To the extent that Defendant's affirmative defenses assert that Mr. Martensen was engaged in "fraud," "self-dealing" or "other acts of misconduct against the Oxbow Companies," these spreadsheets bear directly on Mr. Koch's understanding of Mr. Martensen's alleged conduct while employed by Oxbow and his contention that the events of March 21-22, 2012 were wholly justified. I am hard-pressed to see why Mr. Koch should be permitted to use work product (like these spreadsheets) to attack Mr. Martensen's character or conduct, while simultaneously preventing Plaintiff from challenging the factual underpinnings for those attacks. Fairness dictates that Defendant produce the spreadsheets.

Mr. Koch next argues the Singapore documents are subject to the attorney-client privilege because they involve legal advice between Oxbow employees and Oxbow's legal counsel "concerning legal advice about employment in a foreign office." *See* doc. #117 at 18-19. Plaintiff claims the documents are not privileged because they were prepared in the normal course of business and not in anticipation of litigation, and because they fall under the crime-fraud exception. *See* doc. #108 at 15. Plaintiff cannot invoke the crime-fraud mantra as a substitute for a more developed argument. Mr. Martensen has not presented any evidence to suggest that these documents have any bearing on the false imprisonment claim. In the absence of waiver, these documents are privileged and not discoverable.

   d.   Miscellaneous Documents or Information

Finally, Mr. Martensen's motion to compel seeks an Oxbow study analyzing whether to enter the Chinese market; any employment agreements entered into between Oxbow and Joe Lombardi

since March 2012; and the identity of each Grant Thornton consultant listed in Defendant's privilege log.

It appears that in or around 2008, Oxbow studied the practicality and profitability of selling petroleum coke directly to companies in China.  The study apparently includes recommendations from Larry Black advising against the endeavor due to credit risks and other business-related concerns.  Plaintiff contends that this study was commissioned in the normal course of Oxbow's business and therefore is not privileged or, in the alternative, that any privilege belonging to Defendant Koch or Oxbow was waived with the filing of Oxbow's lawsuit in Florida.  Plaintiff's argument misses the threshold requirement under Rule 26(b)(1).  The relevance of this information to the claims and defenses in this case is not readily apparent to the court and Plaintiff has not come forward with any information or arguments that would cure this deficiency or sustain his burden. *Cf. Johnson*, 238 F.R.D. at 653.

Joe Lombardi is a former Oxbow executive who was interviewed and terminated on March 22, 2012.  Sometime thereafter, Oxbow filed a lawsuit in the California courts accusing Mr. Lombardi of conspiring with Plaintiff to defraud Oxbow.  *See* doc. #108, at 14-15.  Mr. Martensen argues that Oxbow then attempted to persuade Mr. Lombardi to testify against him.  Extending that argument, Mr. Martensen reasons that Mr. Lombardi's employment contracts are relevant to Plaintiff's obstruction claim under 18 U.S.C. § 1512 (b)(1).  Mr. Koch has not been sued in this action for obstruction of justice and the status of Mr. Lombardi's professional relationship with Oxbow is not otherwise relevant.[26]

---

[26] These employment contracts may, however, become relevant under Rule 26(b)(1) if Mr. Lombardi is called as a witness and his credibility is put at issue.  Plaintiff may renew this request if Mr. Lombardi is listed as a defense witness in the Final Pretrial Order.

Finally, Defendant's privilege log is replete with references to unidentified "consultants." *See* doc. #108-2 and #112.  Mr. Martensen originally argued that privileged documents prepared by these consultants relate to Defendant's alleged tax fraud and therefore should be produced pursuant to the crime-fraud exception.  Following an *in camera* review of documents tendered by Plaintiff, I determined that Mr. Martensen had not established the requisite foundation to support a claim of tax fraud or sustain an assertion of the crime-fraud exception predicated on that offense.  Plaintiff now "moves for disclosure of the names of all consultants if this court does not order" production of the related documents referenced in Defendant's privilege log. *See* doc. #108, at 2.

Defendant argues that his privilege log satisfies the requirements of Rule 26(b)(5)(A), that the "consultants" at issue are non-testifying experts protected by Rule 26(b)(4)(D), and that Mr. Martensen has not shown exceptional circumstances to justify requested disclosures.  *See* Fed. R. Civ. P. 26(b)(4)(D)(ii).

By its very terms, Rule 26(b)(4)(D) states that a party may not "discover facts known or opinions held" by a non-testifying expert, but is silent on whether the "identity" of the non-testifying expert is also outside the bounds of discovery.  The Tenth Circuit has held that the identity of a specially retained expert who is not expected to testify at trial is not discoverable "except as provided in Rule 35(b) or upon a showing of exceptional circumstances." *Ager*, 622 F.2d at 503 (internal quotation and citation omitted). *But see In re Welding Fumes Products Liability Litigation*, 534 F. Supp.2d 761, 767-68 (N.D. Ohio 2008) (chronicling the split in circuit authority regarding the scope of protection offered in Rule 26(b)(4)(D)).  Plaintiff's motion to compel does not make any showing of exceptional circumstances, or provide any persuasive rationale for departing from the Tenth Circuit's decision in *Ager*.  To the extent that Defendant Koch is required to produce

relevant portions of the Grant Thornton reports, I will also require disclosure of the "consultants" who authored those particular materials.  In all other respects, I deny Plaintiff's request for the identity of "consultants" cited on Defendant's privilege log.

C.     *Motion for Leave to Extend the Time Limit for Defendant Koch's Deposition*

Plaintiff deposed Defendant for approximately seven and a half hours on December 12, 2013, at a location in West Palm Beach, Florida.  Plaintiff now seeks leave to conduct an additional, three-hour deposition of Defendant (doc. #82).  Rule 30(a)(2)(A)(ii) provides "[a] party must obtain leave of court … if the parties have not stipulated to the deposition and the deponent has already been deposed in the case."  Whether to allow the additional examination of a party already deposed is within the discretion of the trial court.  *Roberts v. State of Okl.*, 110 F.3d 74, 9 (10th Cir. 1997) (citing *Building & Constr. Dep't v. Rockwell Intel Corp.*, 7 F.3d 1487, 1496 (10th Cir.1993)).  "[The court must allow additional [deposition] time consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination."  Fed. R. Civ. P. 30(d)(1); *see also Lammle v. Ball Aerospace & Technologies Corp.*, No. 11-cv-03248-MSK-MJW, 2013 WL 179200, at *1 (D. Colo. January 17, 2013) (granting defendant additional time to examine plaintiff regarding documents not disclosed in first deposition); *Kleppinger v. Texas Dept. of Transp.*, 283 F.R.D. 330, 332-33 (S.D. Tex. 2012) (examining the evolution of requirements imposed by the Federal Rules of Civil Procedure for a party seeking to re-depose another party).  "The party seeking a court order to extend the examination, or otherwise alter the limitations, is expected to show good cause to justify such an order." Advisory Committee Note to the 2000 Amendment to Rule 30; *see also Kleppinger*, 283 F.R.D. at 333.

40

Contrary to Defendant's Response to Plaintiff's Motion to Compel, the reexamination of Mr. Koch does not transgress the barrier imposed by Rule 26(b)(2) against redundant or disproportionate discovery.   Plaintiff's "ample opportunity" to question Mr. Koch regarding the planning and execution of the Bear Ranch events was curtailed by defense counsel's invocation of the attorney-client privilege.   Whether or not Plaintiff's counsel misused time by straying into questionably relevant topics has no bearing on the fact that Defendant Koch refused to answer pertinent questions.  Mr. Koch's counsel proposes that Plaintiff submit questions to which his client will provide written answers, however, this exercise would preclude Plaintiff's counsel from asking immediate and reasonable follow-up questions.  Defense counsel also insists that Mr. Martensen can elicit the same information from other deponents.  While Plaintiff can and perhaps has deposed other persons who participated in planning the company's tax reorganization or participated in planning the Bear Ranch events, those deponents cannot testify to the memories and impressions of Defendant Koch.

In light of this Order granting, in part, Plaintiff's Motion to Compel Defendant's Deposition Testimony and Motion to Compel Production of Documents, the undersigned finds that a limited reexamination of Defendant is warranted.

D.      *Motion to Compel Non-Party's Deposition and Production of Documents*

Plaintiff seeks an order compelling non-party Frederick Bennett to appear for a deposition and produce (1) "all communications to Oxbow employees, agents or representatives from March 2011 to July 2012 including but not limited to emails, letters, memos, invoices, reports and summaries of investigations; and (2) all communications to William Koch or his representative or agents from March 2011 to July 2012 including but not limited to emails, letters, memos, invoices,

reports and summaries of investigation(s)." *See* doc. #123 at p. 5.  Defendant Koch argues that this court lacks jurisdiction to hear this Motion to Compel because the Northern District of Texas is the district in which the parties must comply with the subpoena.  Defendant further argues that the Bennett subpoena seeks testimony of a non-testifying expert under Rule 26(b)(4)(D), whose testimony cannot be obtained absent a showing of exceptional circumstances, as well as information protected by the attorney-client privilege and the work product doctrine.  Finally, Mr. Koch contends that the information sought is not relevant to the claim for false imprisonment.  I find that all of these objections are better addressed in the Northern District of Texas where compliance with the subpoena is required.

Rule 45 was recently amended to provide that all subpoenas must issue from the court in which the underlying action is pending.  *See* Fed. R. Civ. P. 45(a)(2).  Prior to the 2013 amendment, subpoenas for deposition testimony and /or for the production of documents were issued by the court in the district where the deposition would be held and where the documents would be produced. Under that procedure, the issuing court and the court of compliance were the same, and that court exercised jurisdiction over disputes regarding the subpoena.  After the 2013 amendment, the court of compliance still presides over such disputes.  Fed. R. Civ. P. 45(d)(3).  The amended rule provides that "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). In the absence of consent, Magistrate Judge Stickney for the Northern District of Texas did not find exceptional circumstances that would warrant transferring this dispute to the District of Colorado.  *See* doc. #131-1.  I will therefore, deny without prejudice, Plaintiff's Motion to Compel Non-Party's Deposition and

Production of Documents.  The issues framed in that motion are more properly raised in the court of compliance, the Northern District of Texas.

## CONCLUSION

Consistent with the foregoing analysis, Plaintiff's Motion to Compel Defendant Koch's Deposition Testimony (doc. #76) and Plaintiff's Motion to Compel Production of Documents (doc. #108) are granted in part and denied in part.  Defendant Koch must produce the required materials within 21 days, in the absence of further orders from this court or Judge Blackburn.

In view of the additional discovery permitted under this Order, Plaintiff's Amended Motion for Leave to Extend the Time Limit for Defendant Koch's Deposition (doc. #82) is granted.  That re-opened deposition shall be schedule for a date and time convenient to Mr. Koch and counsel. Plaintiff Martensen is granted an additional three hours to depose Mr. Koch.  The scope of that deposition is limited to the specific topics identified herein and the documents disclosed pursuant to this Order.  In anticipation of objections by the parties, I will stay the effect of this Order for fourteen days to permit Mr. Martensen and/or Mr. Koch to seek relief under Fed. R. Civ. P. 72.  Any additional relief beyond that fourteen day period will require filing a motion under D.C.COLO.LCivR.30.2(b).  Plaintiff's Motion to Compel Non-Party Deposition Testimony and Production of Documents (doc. #123) is denied without prejudice.  Each party will bear his own costs incurred in the filing of these motions and the re-opening of Defendant Koch's deposition.

DATED at Denver, Colorado, this 29th day of July, 2014.

BY THE COURT:

s/Craig B. Shaffer
Craig B. Shaffer
United States Magistrate Judge

43